1
2
3
4
5
6
7
8
9          UNITED STATES DISTRICT COURT

10          EASTERN DISTRICT OF CALIFORNIA

11
                        ----oo0oo----
12

13  OLIVIA GARCIA, Acting Regional
    Director of Region 20 of the
14  National Labor Relations
    Board, for and on behalf of
15  the NATIONAL LABOR RELATIONS
    BOARD,
16                                  NO. 2:10-cv-2176 FCD JFM
              Petitioner,
17
         v.                         MEMORANDUM AND ORDER
18
    SACRAMENTO COCA-COLA BOTTLING
19  CO., INC.,

20            Respondent.

21                      ----oo0oo----

22       This matter is before the court on petitioner Olivia

23  Garcia's ("petitioner"), Regional Director of Region 20 of the

24  National Labor Relations Board, for and on behalf of the National

25  Labor Relations Board (the "Board"), petition for an injunction

26  under § 10(j) of the National Labor Relations Act.  Petitioner

27  seeks an interim order required respondent to recognize and

28  bargain with Teamsters Local 150 (the "Union" or the "affiliated

1  Union") pending the Board's final disposition in this case.

2  Respondent Sacramento Coca-Cola Bottling Co., Inc. ("respondent"

3  or the "Employer") opposes the petition.  The court heard oral

4  argument on August 20, 2010.  For the reasons set forth below,

5  the Board's petition for a § 10(j) injunction is GRANTED.

6                              **BACKGROUND**[1]

7       Respondent is a California corporation that owns franchise

8  agreements with Coca-Cola Bottling Co., Inc., under which it is

9  authorized to manufacture, distribute, and sell Coca Cola

10 products in the Sacramento and Modesto geographical areas.

11 (Decl. of Rob Siebers in Supp. of Opp'n to Inj. ("Siebers

12 Decl."), filed Aug. 18, 2010, ¶ 2.)  Sacramento Coca-Cola

13 Bottlers Employees Union ("SCCBE") was an in-house union, formed

14 by the employees of respondent in 1966.  (Affs. In Support of

15 Pet. for Inj. ("App,"), filed Aug. 13, 2010, at 13.)  The unit is

16 comprised of all regular employees engaged in production,

17

18       [1]   The facts of the case are taken from the affidavits and
   supporting documents submitted by the parties.  Respondent filed
19 various objections to petitioner's evidence.  As the court does
   not rely on the challenged evidence in rendering its conclusion,
20 respondent's objections are OVERRULED as moot.

21       Respondent also requested an evidentiary hearing and the
   opportunity to present oral testimony due to "credibility issues"
22 involved in this litigation.  However, because "a conflict of
   evidence does not preclude the Regional Director from making the
23 requisite showing for a § 10(j) injunction," and because the
   facts about which respondent contends there are credibility
24 concerns are irrelevant to the court's analysis, the court DENIED
   respondent's request.  Scott ex rel. NLRB v. Stephen Dunn &
25 Assocs., 241 F.3d 652, 662 (9th Cir. 2001) (abrogation recognized
   on other grounds); see also NLRB v. Electro-Voice, Inc., 83 F.3d
26 1559, 1571 (7th Cir. 1996) (holding that the district court
   applied the wrong standard when it resolved credibility conflicts
27 in the evidence instead of evaluating whether the petitioner had
   presented sufficient evidence to demonstrate a "better than
28 negligible chance of prevailing before the Board").

                              2

1    distribution and maintenance.  (App. at 48.)  The unit is
2    currently comprised of approximately 310-320 of respondent's
3    employees.  (App. at 31; Siebers Decl. ¶ 6.)  The collective
4    bargaining agreement between respondent and the unit extends from
5    November 1, 2009 through October 31, 2013.  (<u>Id.</u> at 47; Siebers
6    Decl. ¶ 36; Ex. O to Siebers Decl.)

7         On March 21, 2010 a vote was held to elect ten new Board of
8    Governors for SCCBE (the "SCCBE Board").  New SCCBE Board members
9    included Jerry Rezendes ("Rezendes") and Dennis Young ("Young")
10   as Chairman and President of the SCCBE Board, respectively.
11   (App. at 1, 13, 25.)  During the three years prior to taking
12   office, Rezendes and Young had been in contact with Rocky Thomas
13   ("Thomas"), an organizer/business representative of Teamsters
14   Local 150, to discuss the possibility of merging SCCBE with
15   Teamsters Local 150.  (<u>Id.</u> at 29.)  After the March 21 election,
16   these discussions took on a more serious nature.  (<u>Id.</u> at 30.)

17        A few weeks later, a SCCBE meeting was scheduled for April
18   25, 2010 as "a general meeting to introduce the newly elected
19   members of the board," discuss finances, and exchange contact
20   information.  (Decl. of Robert Giron in Supp. of Opp'n to Inj.
21   ("Giron Decl."), filed Aug. 18, 2010, ¶ 2; Ex. A to Giron Decl.)
22   Prior to the meeting, approximately four SCCBE Board members were
23   aware of the merger discussions.  (<u>Id.</u> at 2, 6, 7, 29.)
24   Immediately before the meeting, several more were made a aware
25   that there were on-going merger discussions that were kept secret
26   because Rezendes was afraid of retaliation by respondent for
27   suggesting the merger.  (<u>Id.</u> at 2, 6, 18.)
28

                                   3

Fifty to sixty members attended the April 25 meeting.  (Id. at 7.)  Thomas and Teamsters 150 attorney, David Rosenfeld ("Rosenfeld"), were invited to the meeting by Rezendes and were also in attendance.  (Id. at 26.)  After the SCCBE Board members were introduced, a member brought up the possibility of merging with Teamsters 150.  (Id. at 21.)  A motion on the issue was made and seconded.[2]  (Id.)  A heated discussion ensued, during which respondent asserts that Young told the audience that if the vote to merge was not taken straight away, respondent would make the members jobs very hard on them, harass them and/or fire them.  (Id. at 44, 11; Siebers Decl. ¶ 17; Ex. D to Siebers Decl.)  Eventually, Thomas took the floor and read the proposed merger agreement ("Agreement")and answered questions about the potential merger.  (App. at 30.)

Members were asked to stand on opposites sides of the room to show their support or opposition to the merger.  (App. at 12, 23, 30.)  Around 50 members supported the merger; approximately 5 members opposed the merger.  (Id. at 8, 14, 27, 30.)  However, in light of the discussions and the fact that most members were not aware of the merger idea, the SCCBE Vice President suggested that any merger vote should be held at a later time so all members could be consulted.  (Id. at 44.)  Young did not agree.  He stated that everyone had notice and was invited to come and that the meeting was one of the largest turnouts they had ever had.  (Id. at 18.)

---

[2]    Hieu Nguyen was the employee who seconded the motion. She was involved in the initial discussion with Rezendes about merging SCCBE with Teamsters 150 and explained that she was asked to bring this idea up at the April 25 meeting.  (Id.)

4

1   A hand vote of the SCCBE Board was taken and the merger with
2   Teamsters 150 was agreed upon by a majority of the Board of
3   Governers.  (Id. at 14.)

4   Following the vote by the SCBBE Board, SCCBE's president
5   executed the Agreement with Teamsters 150.  (Id. 34.)  The
6   Agreement called for retaining the current collective bargaining
7   agreement between SCCBE and respondent in full force and effect,
8   with no changes in terms or conditions.  (Id.)  The collective
9   bargaining agreement is set to expire in October 2013 and at the
10  time the Union will bargain a new contract.  (Id. at 47.)

11  Under the current Agreement employees can become members of
12  the Union without paying an initiation fee and dues will remain
13  for the same for another 18 to 36 months.  (Id. at 34.)  Any
14  later increase in dues must be approved by the Union members
15  employed at Sacramento Coca-Cola Bottling Co. following the April
16  25 membership meeting.  (Id. at 40.)

17  All Board members were asked and agreed to serve as shop
18  stewards for the Union.  (Id. at 3, 9, 28, 38.)  Once they
19  receive the requisite training, shop stewards will be able to
20  settle grievances at the first or second step of the grievance
21  procedure without assistance from a Union representative; six
22  shop stewards who are former Board of Governors members attended
23  the shop steward training on June 19.  (Id. at 39.)

24  All assets and liabilities of SCCBE were transferred to the
25  Union, including the sole assets of approximately $87,000.
26  (Siebers Decl. ¶ 6.)  These funds were deposited in a separate
27  checking account controlled by the Union to be used only for
28

5

1  representation expenses related to the Sacramento Coca-Cola
2  Bottling Co. unit employees. (App. at 34.)

3       On April 27, 2010, the affiliated Union sent a letter to
4  respondent, advising it that SCCBE had merged with Teamsters
5  Local 150 and designating Thomas as the Union representative.
6  (Siebers Decl. ¶ 14; Exhibit B to Siebers Decl.)  In response, on
7  April 28, respondent posted a letter at the worksite, questioning
8  the validity of the merger. (App. at 37.; Siebers Decl. ¶ 15;
9  Ex. C to Siebers Decl.)  On April 29, ten employees posted a
10  letter protesting the merger, stating that members would be asked
11  to sign a petition to dissolve any relationship with Teamsters
12  Local 150. (Siebers Decl. ¶ 19.)  On May 3, 2010, a petition
13  stating "I DO NOT WANT TO BE AFFILIATED WITH TEAMSTERS LOCAL 150"
14  began circulating among the employees. (App. at 103-119; Siebers
15  Decl. ¶ 7; Ex. K to Siebers Decl.)  Fifty-five signatures were
16  obtained on the first day of the petition. (Siebers Decl. ¶ 21.)

17       Three days later, on May 6, 2010, the Union conducted a
18  noticed meeting for respondent's employees.  Only 10 of the 308
19  bargaining unit employees attended. (Siebers Decl. ¶ 31; Ex. L
20  to Siebers Decl.)

21       On May 20, 2010, respondent's counsel sent a letter to the
22  Union's counsel, expressly providing that it did not recognize
23  the affiliated Union. (App. at 125.)

24       During the summer of 2010, several grievances were filed by
25  the Union on behalf of employees. (App. at 32, 33, 39.)
26  Petitioner asserts that all 16 of these grievances were ignored
27  and remain unresolved. (Decl. Vigent ¶ 9.)  Respondent asserts
28  that it has attempted to resolve all grievances filed since April

25, 2010 only with representatives of "SCCBE," not the Union. (Id.)

   **1.   Respondent's and Employee Filings with the Region**

On May 13, 2010, respondent filed a charge with Region 20 (the "Region"), claiming the Union violated Section 8(b)(1)(A) of the National Labor Relations Act ("NLRA") by restraining, coercing, and threatening employees in order to gain support for the merger. (Decl. Acting Regional Director in Supp. of Pet. for Inj. ("Garcia Decl."), filed Aug. 13, 2010, ¶ 6.)  The charge was investigated, and on June 30, 2010 the Region dismissed it after determining it was without merit. (Decl. of Dennis S. Murphy in Supp. of Opp'n to Inj. ("Murphy Decl."), filed Aug. 18, 2010, ¶ 5; Garcia Decl. ¶ 6.)  On July 12, 2010, respondent appealed the decision. (Garcia Decl. ¶ 6; Siebers Decl. ¶ 34.)  A month later, on August 12, 2010, respondent's appeal was denied by NLRB Office of Appeals. (Murphy Decl. ¶ 4-5; Ex. C to Murphy Decl.)

On May 25, 2010, an employee submitted a petition to the Board, seeking to recall the current Union officials. (Decl. of Robert Giron in Supp. of Opp'n to Inj. ("Giron Decl."), filed Aug. 18, 2010, ¶ 4.)  The Board would not accept the petition. (Id.)

On June 28, 2010, respondent filed petitions for a representative (RM) election with the Region. (Murphy Decl. ¶ 6.)  Attached to the petitions, respondent submitted a supplemental petition, stating that the signatories did not want to be affiliated with Teamsters Local 150, signed by 56% of the bargaining unit employees. (Id.; Siebers Decl. ¶ 7.)  The employees continued to gather signatures and, as of the date of

7

the hearing, the employee petition has been signed by 173
bargaining unit employees. (Giron Decl. ¶5.) On July 7, 2010,
the Region dismissed the employer's petitions for an election,
citing both the contract bar rule and a charge filed by the
Union. (Ex. to Pet'r's Reply Brief, filed Aug. 19, 2010.)

**2.   The Current Litigation**

On May 3, 2010, the Union filed an unfair labor practice
charge against respondent alleging violation of Section
8(a)(1)(5) of the National Labor Relations Act ("NLRA") for
refusing to bargain in good faith. (Decl. Acting Regional
Director in Supp. of Pet. for Inj. ("Garcia Decl."), filed Aug.
13, 2010, ¶ 3.) On June 2, 2010, respondent submitted a response
to Teamsters 150's charge with a petition attached, signed by
approximately 130 employees stating they do not want to be
affiliated with Teamsters. (Murphy Decl. ¶ 3; Ex. B to Murphy
Decl.)

On June 20, 2010, Region 20 issued a complaint against
Respondent on the basis of Teamster Local 150's unfair labor
practice claim. A hearing on the complaint was scheduled to be
heard on August 25, 2010. However, on August 16, 2010, the Union
filed a new unfair labor practice charge with the Board that is
related to petitioner's unfair labor practice claim. (Aff. of
Regional Director, filed Aug. 19, 2010, ¶ 2.) This action will
be heard by an ALJ in October 2010. (Id. ¶ 4.)

On August 13, 2010, petitioner filed 10(j) motion in this
court, seeking an interim bargaining order requiring respondent
to recognize and bargain with the Union during the pendency of
proceedings before the ALJ and the NLRB.

8

1

**ANALYSIS**

2      Section 10(j) of the National Labor Relations Act ("NLRA")

3  provides that, upon issuance of a complaint charging an unfair

4  labor practice, the Board may petition the United States district

5  court for appropriate temporary relief or restraining order, and

6  the court "shall have jurisdiction to grant to the Board such

7  temporary relief or restraining order as it deems just and

8  proper." 29 U.S.C. § 160(j) (2009).   Injunctive relief under §

9  10(j) is intended to preserve the status quo pending final action

10  by the Board.  Scott ex rel. NLRB v. Stephen Dunn & Assocs., 241

11  F.3d 652, 660 (9th Cir. 2001) (abrogation recognized on other

12  grounds).

13      In determining whether interim relief is "just and proper"

14  under the NLRA, the court considers traditional equitable

15  criteria in determining whether injunctive relief should be

16  granted.  Miller v. Pac. Med. Ctr., 19 F.3d 449, 459 (9th Cir.

17  1994) (abrogation recognized on other grounds).   The Ninth

18  Circuit has recently clarified the controlling standard for

19  injunctive relief in light of the Supreme Court's decision in

20  Winter v. Natural Res. Def. Council, -- U.S. --, 129 S. Ct. 365

21  (2008).  Alliance for Wild Rockies v. Cottrell, -- F.3d --, No.

22  09-35756, 2010 WL 2926463, at *6-7 (9th Cir. July 28, 2010); Am.

23  Trucking Ass'ns, Inc. v. City of Los Angeles, 559 F.3d 1046, 1052

24  (9th Cir. 2009).   A party seeking a preliminary injunction must

25  demonstrate that he is likely to succeed on the merits, that

26  irreparable harm is likely in the absence of preliminary relief,

27  that the balance of equities tips in favor of such relief, and

28  that an injunction is in the public interest.  Am. Trucking, 559

F.3d at 1052.  A preliminary injunction is also appropriate when
the moving party demonstrates "that serious questions going to
the merits [are] raised and the balance of hardships tips sharply
in the [moving party's] favor," so long as that party can
establish the other <u>Winter</u> factors, including the likelihood of
irreparable harm.  <u>Alliance for Wild Rockies</u>, 2010 WL 2926463, at
* 7.  However, when evaluating a petition under § 10(j), the
court must analyze the request "through the prism of the
underlying purpose of § 10(j), which is to protect the integrity
of the collective bargaining process and to preserve the Board's
remedial power while it processes the charge."  <u>Miller</u>, 19 F.3d
at 459-60.

     "In assessing whether the Board has met its burden, it is
necessary to factor in the district court's lack of jurisdiction
over unfair labor practices, and the deference accorded to NLRB
determinations by the courts of appeals."  <u>Id.</u> at 460 (citing
<u>NLRB v. City Disposal Sys., Inc.</u>, 465 U.S. 822, 829 (1984) ("[O]n
an issue that implicates [the Board's] expertise in labor
relations, a reasonable construction by the Board is entitled to
considerable deference[.]"); <u>Ford Motor Co. v. NLRB</u>, 441 U.S. 488
(1979) ("Of course, the judgment of the Board is subject to
judicial review; but if its construction of the statute is
reasonably defensible, it should not be rejected merely because
the courts might prefer another view of the statute.").

**A.   Success on the Merits**

     The district court must evaluate the likelihood of success
in the context that the Board's determination on the merits will
be given considerable deference on appeal.  <u>Id.</u>  "A conflict in

10

evidence does not preclude the Regional Director from making the requisite showing for a § 10(j) injunction." Scott, 241 F.3d at 662; see Seeler v. Trading Port, Inc., 517 F.2d 33, 36-37 (2d Cir. 1975) (holding that where "there are disputed issues of fact in the case, the Regional Director should be given the benefit of the doubt in a proceeding for § 10(j) relief"). "Rather, to satisfy the 'likelihood of success' prong of the traditional equitable test, he need only show 'a better than negligible chance of success.'" Id. (citing Electro-Voice, 83 F.3d at 1568). Moreover, the Ninth Circuit has instructed that "[e]ven on an issue of law, the district court should be hospitable to the views of the General Counsel, however novel." Miller, 19 F.3d at 460 (quoting Danielson v. Joint Bd. of Coat, Suit & Allied Garment Workers' Union, 494 F.2d 1230, 1245 (2d Cir. 1974)). On a motion for a 10(j) injunction, it is not the duty of the district court "to resolve the factual disputes or the legal issues involved. Those are for the Board." Kennedy v. Teamsters Local, 443 F.2d 627, 630 (9th Cir. 1971). "In short, the Board can make a threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory." Miller, 19 F.3d at 460.[3]

---

[3]     Respondent incorrectly asserted during oral argument that the Miller standard with respect to likelihood of success on the merits is no longer applicable after the Ninth Circuit's decisions in McDermott v. Ampersand Publ'g, LLC, 593 F.3d 950 (9th Cir. 2010) and Small v. Operative Plasters' & Cement Masons' Int'l Ass'n Local 200, AFL-CIO, -- F.3d --, 2010 WL 2681330 (9th Cir. July 8, 2010). The Miller standard was overruled regarding its analysis of irreparable injury, see infra at 28, but **not**
(continued...)

1        **1.    Question of Representation**

2        Petitioner asserts that it can establish a likelihood of

3   success on the merits because, in accordance with SCCBE's bylaws,

4   a majority of the Board of Governor's approved the merger.

5   Respondent contends that petitioner cannot demonstrate a

6   likelihood of success on the merits because there is a question

7   of representation, as it is unclear whether a majority of

8   employees continue to support the Union after it merged with

9   Teamsters Local 150.

10       Section 7 of the NLRA "guarantees employees the right 'to

11  bargain collectively through representatives of their own

12  choosing,' 29 U.S.C. § 157, and the Board is empowered to

13  determine representation on petition of employees or the

14  employer." <u>NLRB v. Fin. Inst. Emps. of Am. Local 1182 ("Seattle-</u>

15  <u>First")</u>, 475 U.S. 192, 198 (1986) (citing 29 U.S.C. §

16  159(c)(1)(A)(i), 159(c)(1)(B)).   The NLRA also "recognizes that

17  employee support for a certified bargaining representative may be

18  eroded by changed circumstances."   <u>Id.</u>   The Supreme Court has

19  _____

20         [3](...continued)
    likelihood of success on the merits.  The <u>McDermott</u> court
21  specifically reversed <u>Miller</u>'s prior holding that irreparable
    injury could be presumed in light of the Supreme Court's decision
22  in <u>Winter</u>.   593 F.3d at 957.   It did not address the district
    court's review of the facts under <u>Miller</u>.   Further, while the
23  <u>Small</u> court addressed <u>Miller</u>'s likelihood of success prong in
    dicta, the court noted that <u>Small</u> was a § 10(l) case, <u>not a §</u>
24  <u>10(j) case</u>, and that the rationale for <u>Miller</u>'s standard
    regarding review of the facts did not apply where the Region is
25  <u>required</u> to petition for injunctive relief under § 10(l).   2010
    WL 2681330, at *6 & n.3.   Accordingly, the court does not
26  conclude that the Supreme Court's decision in <u>Winter</u>, nor the
    Ninth Circuit's cases interpreting its applicability to labor
27  disputes, substantially changes the standard applied in
    determining the likelihood of success on the merits for purposes
28  of a § 10(j) injunction.

                                   12

noted that "a new affiliation may substantially change a
certified union's relationship with the employees it represents,"
and that "[t]hese changed circumstances may in turn raise a
'question of representation,' if it is unclear whether a majority
of employees continue to support the reorganized union." Id. at
202.[4]

The NLRA "assumes that stable bargaining relationships are
best maintained by allowing an affiliated union to continue
representing a bargaining unit unless the Board finds that the
affiliation raises a question of representation." Id. at 209.
"If the Board finds that affiliation raises a question of
representation 'undermining . . . the Board's own election and
certification procedures,' it can refuse to consider the union's
unfair labor practice charge, and is authorized to conduct a
representation election." Id. at 202 (quoting Amoco Production
Co., 262 N.L.R.B. 1240, 1241 (1982)).[5] "Any uncertainty on the
employer's part does not relieve him of his obligation to bargain

---

[4] In the case of affiliation, a newly affiliated union
may choose not petition the Board to amend its certification,
"but will instead wait to see whether the employer will continue
to bargain.  If the employer refuses to bargain, the union may
then file an unfair labor practice charge with the Board." Id.
at 200 n.8.  This is the procedural posture in this case.
However, the Board has "used the same standards to examine
affiliations whether the issue arose as a defense to an unfair
labor practice charge or in a petition to amend a certification.
Id.

[5] However, the Supreme Court expressly noted that the
NLRA "authoriz[es] the Board to conduct a representation election
only where affiliation raises a question of representation." Id.
at 203 (emphasis in original).  Where a question of
representation has not been sufficiently raised, the Board has no
authority to act.  Id.

13

1   collectively." <u>Id.</u> at 209 (emphasis added).[6]  The Supreme Court

2   has expressly noted that it has "rejected the position that

3   employers may refuse to bargain whenever presented with evidence

4   that their employees no longer support their certified union."

5   <u>Auciello Iron Works, Inc. v. NLRB</u>, 517 U.S. 781, 790 (1996).  The

6   Court reasoned that "[t]o allow employers to rely on their

7   employees' rights in refusing to bargain with the formally

8   designated union is not conducive to [industrial piece], it is

9   inimical to it." <u>Id.</u> (quoting <u>Brooks v. NLRB</u>, 348 U.S. 96, 103).

10  Rather, an employer's relief is to petition the Board, not to

11  rely on employees' rights. <u>Seattle-First</u>, 475 U.S. at 209; <u>see</u>

12  <u>Brooks</u>, 348 U.S. at 103; <u>see</u> <u>The Raymond F. Kravis Center for the</u>

13  <u>Performing Arts ("Kravis")</u>, 351 N.L.R.B. 143, 147 (2007) ("<u>[W]hen</u>

14  <u>there is a union merger or affiliation, an employer's obligation</u>

15  <u>to</u> <u>recognize</u> <u>and bargain with an incumbent union continues</u> unless

16  the changes resulting from the merger or affiliation are so

17  significant as to alter the identity of the bargaining

18  representative.") (emphasis added).

19      Moreover, the NLRB has concluded that "an employer is not

20  relieved of its bargaining obligation merely because the merger

21  or affiliation is accomplished without due process safeguards."

22  <u>Kravis</u>, 351 N.L.R.B. at 143, 146 (holding that "the lack of a

23  membership vote concerning union affiliation is insufficient to

24

25  _____

26      [6]    At oral argument, respondent's counsel argued that
    <u>Seattle-First</u> supported his contention that an employer has the
27  right to unilaterally withdraw recognition after an affiliation
    if it reasonably believes the majority of unit employees does not
28  support the affiliated union.  This is not the holding of
    <u>Seattle-First</u>.

raise a question concerning representation").[7]  Further, the NLRB
has held that an employer may not refuse to recognize a valid
affiliation even though a majority of the employees later states
that they do not support the affiliation.  <u>Tawas Indus., Inc.</u>,
336 N.L.R.B. 318, 318-19 (2001).  In <u>Tawas</u>, a majority of the
respondent's employees voted to affiliate its small independent
union, TIWA, with UAW.  <u>Id.</u> at 318.  However, subsequent to the
vote but before UAW had committed any time or resources to
representing the employees, a majority of employees conveyed to
the respondent that they did not want to be represented by UAW.
<u>Id.</u> at 319.  The respondent informed UAW that it had concluded
that the affiliation was not supported by a majority of the
employees and thus, refused to recognize the affiliation.  <u>Id.</u> at
318.  The NLRB held that the respondent "could not base its
refusal to recognize TIWA's undisputedly valid affiliation with
the UAW on the employees' subsequent disaffiliation effort, even
if that effort is regarded as untainted, objective evidence that
the affiliated union had lost majority support."  <u>Id.</u> at 319.
The Board reasoned that affiliation or disaffiliation decisions
involved essentially internal matters to be governed by the
union's own procedures and "that are not effectively subject to
an employer's veto."  <u>Id.</u>  Because union procedures were used to
accomplish the affiliation, but were not used to undo the
affiliation, the respondent was obligated to recognize the
affiliation.  <u>Id.</u>

---

[7]     At oral argument, respondent also asserted that the
Board's decision in <u>Kravis</u> supported unilateral withdrawal of
recognition by an employer if an affiliation was not supported by
a majority of employees.  This is not the holding of <u>Kravis</u>.

1    In this case, SCCBE's By-Laws provide, in pertinent part,
2  that "[t]he function of the Board of Governors is to govern the
3  general business of the union" and that "all motions coming
4  before the Board of Governors shall be passed only by a majority
5  vote." (App. 119-20).  Petitioner presents evidence that on
6  April 25, 2010, the President of the Board put the matter of
7  merging SCCBE with Local Teamsters 150 to a vote, and the Board
8  voted by a majority to merge with Teamsters Local 150.
9  Furthermore, there is no evidence that the employees or Union
10 subsequently initiated or completed steps to disaffiliate.
11 Accordingly, petitioner has set forth some evidence that the
12 affiliation with Teamsters Local was made in accordance with
13 SCCBE's bylaws and was valid.  See Kravis, 351 N.L.R.B. at 143,
14 146-47 (holding that affiliation was valid when it was conducted
15 in accordance with the union's constitution but without a vote by
16 union members).

17   Respondent contends that the vote by the Board of Governors
18 has no relevance because this type of action requires an
19 amendment to the SCCBE By-Laws because it eliminates the Bottler
20 Union as the unit's exclusive representative, as guaranteed by
21 that document.  Pursuant to SCCBE By-Laws, the "By-Laws may be
22 amended by a two-thirds (2/3) majority vote of the members
23 present at a duly called meeting." (App. 122.)  However, the
24 court need not reach the determination of which By-Laws apply to
25 the decision to affiliate for purposes of a 10(j) injunction.
26 Rather, petitioner has submitted evidence to support its tenable
27 legal theory, namely that a majority vote by the Board of
28 Governors was sufficient because the Union was not eliminated,

16

but merely merged with Teamsters Local 150.  This is sufficient
to set forth a threshold showing of likelihood of success.

Respondent also contends that it properly petitioned for an
election instead of recognizing Teamsters Local 150 because it
had evidence that a majority of employees did not support
affiliation.[8]  Respondent's implied assertion, that an employer
is shielded from a refusal to bargain charge by the filing of a
petition for election, is directly contradicted by Ninth Circuit
precedent.  The Ninth Circuit has expressly held that "the filing
of an RM petition by an employer does not in itself suspend the
employer's duty to bargain.  Nor is that duty to bargain
suspended when the Regional Director schedules a hearing based on
the employer's petition alone."  N.T. Enloe Mem'l Hosp. v. NLRB,
682 F.2d 790, 794 (9th Cir. 1982); see Brooks v. NLRB, 348 U.S.
96, 103 (1954) ("If an employer has doubts about his duty to
continue bargaining, it is his responsibility to petition the
Board for relief, *while continuing to bargain in good faith* at
least until the Board has given some indication that his claim
has merit.") (emphasis added); see also RCA del Caribe, Inc., 262
N.L.R.B. 963, 965 (1982) (holding that the filing of a
representation petition does not require nor permit an employer
"to withdraw from bargaining or executing a contract with an
incumbent union").  The Ninth Circuit reasoned that there is no
compelling policy reason to suspend such an obligation because
"[o]therwise, an employer could file a petition and rely on the

_____

[8]     Moreover, respondent cites no authority for its other
implied assertion that there must be demonstrated majority
support for the newly merged union in order for that merger to be
valid. Cf. Kravis, 351 N.L.R.B. at 143, 146-47.

17

petition alone as justification for suspension of bargaining."
Id. Accordingly, respondent's assertion that it properly filed a
petition for a representative election, which was denied and is
currently on appeal, does not provide an affirmative defense to
plaintiff's allegations of unfair business practices.[9]

**2.   Substantial Continuity**

Petitioner also asserts that it is likely to succeed on the
merits because there is substantial continuity in representation
between SCCBE and Local Teamsters 150.  Respondent, however,
contends that there is a substantial change in the relationship
that justifies its refusal to recognize or bargain with the
affiliated Union.

The Supreme Court has recognized that in the context of an
affiliation, just as "with any organizational and structural
change, [the] new affiliation may substantially change a
certified union's relationship with the employees it represents."
Seattle-First, 475 U.S. at 202.  These substantial changes may
then raise a question of representation and thus, "to protect the
employees' interests, the situation may require that the Board
exercise its authority to conduct a representation election."
Id. (citing 19 U.S.C. § 159(c)(1)).  The Court has cautioned,
though, that "the Board's decision must take into account that
'[t]he industrial stability sought by the Act would unnecessarily
be disrupted if every union organizational adjustment were to
result in displacement of the employer-bargaining representative

---

[9]      The court notes that the representative election was
requested by the employer, not employees, a difference that the
Ninth Circuit has found important.  Id. at 794 n.2.

1  relationship.'" Id. at 202-03 (quoting Canton Sign Co., 174

2  N.L.R.B. 906, 909 (1969), *enf. denied on other grounds*, 457 F.2d

3  832 (6th Cir. 1972)).

4      In determining whether there is substantial continuity after

5  an affiliation, the Board considers the totality of the

6  circumstances, "eschewing the tendency toward a 'mechanistic

7  approach' or the use of a 'strict checklist.'" Mike Basil

8  Chevrolet, Inc., 331 N.L.R.B. 1044, 1044 (2000) (quoting Sullican

9  Bros. Printers, 317 N.L.R.B. 561, 563 (1995), *enf.* 99 F.3d 1217

10 (1st Cir. 1996)).  Rather, the Board has held that "the critical

11 question is whether the 'changes are so great that a new

12 organization has come into being.'" Id. at 1044-45; May Dep't

13 Stores Co., 289 N.L.R.B. 661, 665 (1988) ("[T]he general test for

14 determining whether the affiliation of a bargaining

15 representative with another labor organization raised a question

16 concerning representation is whether the affiliation produces a

17 change that is *sufficiently dramatic* to alter the union's

18 identity.") (emphasis in original) (internal quotations and

19 citations omitted).  The Board considers factors such as:

20         continued leadership responsibilities by the existing
           union officials; the perpetuation of membership rights
21         and duties, such as eligibility for membership,
           qualification to hold office, oversight of executive
22         council activity, the dues/fees structure, authority to
           change provisions in the governing documents, the
23         frequency of membership meetings, the continuation of
           the manner in which contract negotiations,
24         administration, and grievance processing are
           effectuated; and the preservation of the certified
25         union's physical facilities, books, and assets.

26 W. Commercial Transp., 288 N.L.R.B. 214, 217 (1988).  The Board

27 has previously rejected relative sizes of the two organizations,

28 some loss of autonomy, or a subsequent lack of total control in

1  handling grievances as a basis for finding discontinuity.  <u>Mike</u>

2  <u>Basil Chevrolet, Inc.</u>, 331 N.L.R.B. at 1044 (holding that there

3  was substantial continuity despite merger with larger

4  organization, some loss of autonomy previously enjoyed by

5  employees, and loss of complete control over, though not

6  involvement in, grievance handling); <u>CPS Chem. Co.</u>, 324 N.L.R.B.

7  1018, 1021 (1997), *enf*. 160 F.3d 150 (3d Cir. 1998) (holding that

8  neither differences in size, bylaws, and internal procedures, nor

9  the transfer and commingling of assets was sufficient to

10  demonstrate a discontinuity of representation); <u>May Dep't Stores</u>

11  <u>Co.</u>, 289 N.L.R.B. at 665 (holding that there was no discontinuity

12  where the record established some organization changes and a

13  slight diminution in autonomy, but where the leaders and

14  essential structures remained the same); <u>cf.</u> <u>W. Commercial</u>

15  <u>Transp.</u>, 288 N.L.R.B. at 217-18 (holding that there was not

16  substantial continuity where original union lost virtually all

17  its autonomy by being totally submerged by the affiliated union,

18  no role was open to the original union's officers, and all day-

19  to-day contract administration was taken over by the affiliated

20  union's staff member).  Moreover, the Board has concluded that

21  substantial continuity may be demonstrated by evidence such as

22  the eligibility of current members to join the larger union

23  without paying its initiation fees and without an immediate

24  significant increase in membership dues.  <u>CPS Chem. Co.</u>, 324

25  N.L.R.B. at 1021.

26      In this case, petitioner presents evidence that the merger

27  agreement between SCCBE and Teamsters Local 150 calls for

28  retaining the current collective-bargaining agreement between

20

1   SCCBE and respondent in full force and effect, with the merger

2   changing no terms or conditions of employment. (App. at 34.) At

3   the time the current contract expires in November 2013, the Union

4   intends to bargain a new contract based on proposals generated by

5   the bargaining unit membership and presented to its negotiating

6   committee through an elected proposal committee. (<u>Id.</u> at 40.)

7   The Union has also indicated that it intends for the former

8   members of SCCBE's Board of Governors to serve on the negotiating

9   committee. (<u>Id.</u>)  While all assets and liabilities of SCCBE were

10  transferred to the Union, including the sole assets of

11  approximately $87,000, it was deposited in a separate checking

12  account controlled by the Union to be used only for

13  representation expenses related to the Sacramento Coca-Cola

14  Bottling Co. unit employees. (<u>Id.</u> at 41.)  Further, current

15  employees can become members of the Union without paying an

16  initiation fee and dues will remain for the same for another 18

17  to 36 months. (<u>Id.</u> at 40.)  Moreover, any increase in dues must

18  be approved by the Union members employed at Sacramento Coca-Cola

19  Bottling Co. (<u>Id.</u>)  Finally, following the April 25 membership

20  meeting, all ten Board of Governors were asked and agreed to

21  serve as shop stewards for the Union. (<u>Id.</u> at 38.)  Once they

22  receive the requisite training, shop stewards will be able to

23  settle grievances at the first or second step of the grievance

24  procedure without assistance from a Union representative; six

25  shop stewards who are former Board of Governors members attended

26  the shop steward training on June 19. (<u>Id.</u> at 39.)  Based upon

27  this evidence, petitioner has made a showing that the merger

28

between SCCBE and Teamsters Local 150 did not dramatically alter the Union's identity or create a wholly new organization.

While respondent disputes the continuity between SCCBE and Teamsters Local 150, this court need not reach the ultimate determination of this issue.  Applying the undisputed terms of the merger agreement to Board precedent, petitioner has demonstrated that (1) the current members to join the larger Union without paying its initiation fees and without an immediate significant increase in membership dues, see CPS Chem. Co., 324 N.L.R.B. at 1021; (2) a majority of the Board of Governors will have a leadership role over its unit employees as shop stewards, see May Dep't Stores Co., 289 N.L.R.B. at 665; (3) the stewards will be involved in, though not have control over, the grievance, see May Dep't Stores Co., 289 N.L.R.B. at 665; and (4) the assets of SCCBE will continue to be used solely for representation expenses related to unit employees.  Accordingly, petitioner has presented some evidence and a tenable legal theory that there is substantial continuity in representation between SCCBE and Local Teamsters 150, and thus has demonstrated a likelihood of success on the merits on this issue for purposes of a 10(j) injunction.

### 3.   Contract Bar Doctrine

Petitioner also asserts that it has demonstrated a likelihood of success on the merits because the petition signed by a majority of employees does not trigger a representation election because the contract bar doctrine prohibits any such election.  Respondent contends that the contract bar rule does not apply to the circumstances in this case.

1    The Board's contract bar doctrine generally provides that a

2  contract with a fixed term duration of no more than three (3)

3  years serves as a bar to elections for the entire three year

4  term.  <u>General Cable Corp.</u>, 139 NLRB 1123, 1124-25 (1962).

5  Where, as in this case, the contract has a longer fixed term, the

6  contract bar precludes an election for the initial three years.

7  <u>Id.</u>

8    The purpose of the rule is "to promote industrial stability

9  between contractual partners and to afford employees a reasonable

10  opportunity to change or eliminate their bargaining

11  representative."  <u>East Mfg. Corp.</u>, 242 N.L.R.B. 5, 6 (1979).  In

12  order to protect the bargaining atmosphere, the rule is applied

13  "even if a majority of the employees withdraw their support."

14  <u>Pioneer Inn Assocs. v. NLRB</u>, 578 F.2d 835, 838 (9th Cir. 1978)

15  (citation omitted).  Indeed, the Board has expressly stated, "we

16  cannot interpret our contract-bar rules in such a way as to

17  permit employers or certified unions to take advantage of

18  whatever benefits may accrue from the contract with the knowledge

19  that they have an option to avoid their contractual obligations

20  and commitments through the device of a petition to the Board for

21  an election."  <u>Montgomery Ward & Co.</u>, 137 N.L.R.B. 346, 348-49

22  (1962).

23    The Board has examined the applicability of the contract bar

24  rule in the context of an affiliation case where, as here,

25  employees expressed dissatisfaction with the union after the

26  merger took place.  <u>Tawas</u>, 336 N.L.R.B. at 320.  In <u>Tawas</u>, the

27  Board expressly held that "a disaffiliation is a change in the

28  legal and institutional relationships between two unions.  It

1  cannot be carried out externally to the unions." <u>Tawas</u>, 336

2  N.L.R.B. at 320.  To hold otherwise and allow an employer to

3  refuse to recognize an affiliation, would effectively give

4  respondent "power to veto" and allow outside interference with

5  internal union decisionmaking protected by the NLRA.  <u>Id.</u>

6  Therefore, the Board instructed that when a Union effects a valid

7  affiliation and an employer has doubts about his duty to continue

8  bargaining, "it is [the employer's] responsibility to petition

9  the Board for relief at the appropriate time." <u>Id.</u>[10]  Moreover,

10 the Board expressly noted that "[u]nder well-established

11 principles, the respondent could not lawfully withdraw

12 recognition from the union while the collective-bargaining

13 agreement was in effect, even if a majority of bargaining unit

14 members no longer supported" the affiliated Union.  <u>Id.</u>

15      The court finds that the Board's decision in <u>Tawas</u>

16 substantially supports petitioner's position that the contract

17 bar rule applies to this case and prevents respondent from

18 seeking an election or withdrawing recognition from the Union.

19 As set forth above, petitioner has presented sufficient evidence

20 and argument to support its assertion that a valid affiliation

21 was effected at the April 25, 2010 meeting and that there was

22 substantial continuity in representation.  <u>See</u> <u>Yates Industries</u>,

23 264 N.L.R.B. 192, 203 (1982) ("[A] mere change in designation or

24 affiliation of the bargaining representative does not of itself

25 warrant a conclusion that a contract is no longer a bar nor does

26

27      [10]    The Board also noted that to the extent employees want
   to undo a union affiliation, "they can – and must – pursue their
28 goal through internal union channels." <u>Id.</u>

                              24

it automatically relieve the employer of the obligation to
bargain with the 'successor' union."). Further, it is undisputed
that the collective bargaining agreement is in effect from
November 1, 2009 though October 31, 2013. As such, the contract
bar doctrine does not permit a window for questioning
representation until 2012. Accordingly, petitioner has shown a
likelihood of success on that merits that, as in <u>Tawas</u>,
respondent must continue to bargain with the Union, even if a
majority of bargaining members no longer support the affiliated
Union.

    **4.   Decertification/Disaffiliation Petition**[11]

    Petitioner also asserts that it has demonstrated a
likelihood of success on the merits because the petition, signed
by 56% of the employees and attached to the employer's RM
petition, is an invalid instrument with which to decertify the
Union. Respondent contends that the employee petition is a valid
instrument that clearly sets forth the intention of the
signatories to express the desire not to be represented by a
Union that is affiliated with Teamsters Local 150. Impliedly,
respondent contends that it was entitled to withdraw recognition

---

[11]   Petitioner disputes the validity of the petition on the
basis that it simply opposes affiliation and does not evince the
requisite intent to decertify the Union. As set forth above, the
Board has noted that disaffiliation efforts made directly with an
employer is invalid. <u>Tawas</u>, 336 N.L.R.B. at 320. However,
assuming *arguendo* that the employee petition was sufficient to
evince dissatisfaction with the Union representation, as set
forth *infra*, respondent still did not have a valid basis for
withdrawal of recognition at the time it acted.

based upon a lack of majority support, evidenced by the

petition.[12]

    "[A]n employer may unilaterally withdraw recognition from an

incumbent union only where the union has actually lost the

support of the majority of the bargaining unit employees."

Levitz Furniture Co. of the Pacific, Inc., 333 NLRB 717, 717, 723

(2001).   In Levitz, the Board adopted a more stringent standard

for withdrawals of recognition.   Id. at 723.   In doing so, the

Board relied upon the fundamental policies of the NLRA,

specifically those underlying the presumption of continuing

majority status:   protecting employees right to choose or reject

collective-bargaining representatives; encouraging collective

bargaining; and promoting stability in bargaining relationships.

Id.   In light of these underlying goals, the Board held that "an

employer who *withdraws* recognition from an incumbent union, in

the honest but mistaken belief that the union has lost majority

support, should be found to violate Section 8(a)(5)."   Id. at

_____

    [12]   To the extent respondent merely contends that the
employee petition formed a "good faith, reasonable doubt" to
support the Employer's of filing of a petition for representative
election, as set forth above, such a filing does not relieve the
employer from its obligations to recognize and bargain with the
incumbent union, in this case, Local Teamsters 150.   See Dresser
Indus., Inc., 264 N.L.R.B. 1088, 1089 (1982) ("[T]he mere filing
of a decertification petition will no longer require or permit an
employer to withdraw from bargaining or executing a contract with
an incumbent union.").

    The court also notes that, pursuant to the contract bar
rule, "whatever the employer's dilemma, when faced with competing
representational claims, it cannot withdraw recognition from an
incumbent union during the term of the agreement."   Tawas, 336
N.L.R.B. at 320.   As set forth above, the court concludes that
petitioner has shown that the contract bar rule likely applies in
this case.   However, for the sake of completeness, the court
addresses the merits of respondent's argument regarding
withdrawal of recognition.

725.  Good faith is not a defense.  <u>Id.</u>  The Board emphasized
"that an employer with objective evidence that the union has lost
majority support – for example, a petition signed by a majority
of the employees in the bargaining unit – withdraws recognition
at its peril."  <u>Id.</u>  Further, the Board acknowledged that it
concluded "it entirely appropriate to place the burden of proof
on employers to show actual loss of majority support."  <u>Id.</u>

In this case, the evidence demonstrates that respondent
immediately withdrew recognition of the Union after it received
notice of SCCBE's merger with Teamsters Local 150 on April 27,
2010 and before it had any evidence that a majority of employees
allegedly did not support the affiliated Union.  Specifically, on
April 28, respondent posted a letter questioning the validity of
the merger after "at least 9" of the 308 unit employees contacted
management to express their dissatisfaction with the merger.
(App. at 37.)  Further, petitioner presents evidence that
beginning on May 7, 2010, respondent failed to respond to
grievances file by the Union on behalf of unit employees.  (App.
at 32-33, 39.)  By letter dated May 20, 2010, counsel for
respondent expressly informed counsel for Teamsters Local 150
that respondent did not recognize Teamsters Local 150 as the
collective bargaining representative of its employees and that it
continued to recognize SCCBE as the exclusive bargaining
representative.  (App. at 125-26.)  However, as of May 20, 2010,
respondent was only aware of 130 employee signatures out of 308
unit employees on the disaffiliation petition.  Indeed,
respondent did not file a petition for a representative election
with the Board until June 28, 2010, with a supplemental petition

1    signed by 56% of the bargaining unit.  (Murphy Decl. ¶ 6.)

2    Accordingly, there is no evidence that, at the time the Employer

3    withdrew recognition from the affiliated Union, it knew that the

4    majority of unit employees actually did not support the

5    affiliated Union.  As such, respondent's arguments with respect

6    to the effect of the decertification/disaffiliation petition are

7    without merit.

8    **B.    Irreparable Harm**

9         The Ninth Circuit has previously held that "if the Board

10   demonstrates that it is likely to prevail on the merits, [the

11   court] presume[s] irreparable injury," but "[i]f the Board has

12   only a fair chance of succeeding on the merits, the court must

13   consider the possibility of irreparable injury."  <u>Miller</u>, 19 F.3d

14   at 460.  However, the Ninth Circuit recently clarified that "in

15   evaluating the validity of the district court's analysis of the

16   equitable factors, we must employ the Supreme Court's recent

17   interpretation of the threshold showing necessary for granting

18   such an 'extraordinary remedy.'"  <u>McDermott v. Ampersand Publ'g,

19   LLC</u>, 593 F.3d 950, 957 (9th Cir. 2010) (quoting <u>Winter</u>, 129 S.

20   Ct. at 374-76).  Accordingly, a party seeking interim injunctive

21   relief under § 10(j) must demonstrate "that he is likely to

22   suffer irreparable harm in the absence of preliminary relief."

23   <u>Id.</u> (quoting <u>Winter</u>, 129 S. Ct. at 374).

24        The Ninth Circuit has noted that "the passage of the statute

25   is itself an implied finding by Congress that violations will

26   harm the public."  <u>Miller</u>, 19 F.3d at 459.  Further, the court

27   "must take into account the probability that declining to issue

28   the injunction will permit the unfair labor practice to reach

28

1  fruition and thereby render meaningless the Board's remedial

2  authority." <u>Id.</u> at 460.

3      Moreover, courts have historically held that withdrawal of

4  union recognition is often irreparable.  <u>See</u> <u>Int'l Union of</u>

5  <u>Elec., Radio & Machine Workers v. NLRB</u>, 426 F.2d 1243, 1249 (D.C.

6  Cir. 1970) ("Employee interest in a union can wane quickly as

7  working conditions remain apparently unaffected by the union or

8  collective bargaining.  When the company is finally ordered to

9  bargain with the union some years later, the union may find it

10 represents only a small fraction of employees."); <u>Reichard v.</u>

11 <u>Foster Poultry Farms</u>, 425 F. Supp. 2d 1090, 1100 (E.D. Cal.

12 2006).  Specifically, the Supreme Court has noted, "Out of its

13 wide experience, the Board many times has expressed the view that

14 the unlawful refusal of an employer to bargain collectively with

15 its employees' chosen representatives disrupts the employees'

16 morale, deters their organizational activities, and discourages

17 their membership in unions."  <u>Franks Bros. Co. v. NLRB</u>, 321 U.S.

18 702, 704 (1944).

19     In light of the implicit finding by Congress and the

20 evidence set forth in this case, petitioner has demonstrated that

21 irreparable injury is likely to occur in the absence of

22 injunctive relief, including an interim bargaining order.

23 Specifically, petitioner presents evidence that anti-Union

24 sentiment has increased among the employees over the time that

25 respondent has refused to recognize the affiliated Union as the

26 bargaining representative of its employees.  While respondent

27 presents evidence that 55 signatures were obtained on May 3, the

28 first day the disaffiliation petition was available, it took

1  until June 27, 2010 to obtain a majority of the bargaining unit

2  employees to sign.   In essence, the longer respondent refused to

3  recognize the affiliated Union, the more dissatisfied employees

4  apparently became with being affiliated with Teamster Local 150.

5  Further, petitioner presents attendance at Union meetings has

6  substantially declined since respondent has failed to recognize

7  or bargain with the Union.   This sequence of events lends

8  credence to petitioner's contention that support for and

9  confidence in the Union is waning because of respondent's

10 continued refusal to recognize the Union.[13]

11     Therefore, petitioner has demonstrated a likelihood of

12 irreparable injury in the absence of injunctive relief.

13 **C.   The Balance of Hardships and Public Interest**

14     "In § 10(j) cases, the public interest is to ensure that an

15 unfair labor practice will not succeed because the Board takes

16 too long to investigate and adjudicate the charge.   Thus, courts

17 must consider the extent to which this interest is implicated

18 under the circumstances of the particular case."   Miller, 19 F.3d

19 at 460.   In this case, petitioner has presented evidence that the

20 Union completed a valid merger and has maintained substantial

21 continuity with SCCBE, but that it has been prevented by

22 respondent from representing its members.   As such, the public

23

24     [13]   At oral argument, respondent's counsel, in arguing that
there was no substantial continuity after the merger, asserted
25 that bargaining unit employees have not received the same
bereavement benefits.   Petitioner's counsel asserted that the
26 Union only became aware of this problem when respondent raised
the issue in its opposition filed in this case.   The court finds
27 that the Union's inability to obtain this type of information is
only further evidence of the likelihood of irreparable injury
28 caused by respondent's conduct.

1  interest is served by recognizing the Union as the collective
2  bargaining representative pending ultimate determination of the
3  alleged unfair labor practices.

4      In weighing the balance of hardships, the court must
5  similarly take into account the probability that declining to
6  enter an injunction will render meaningless the Board's remedial
7  authority.  <u>Id.</u>  The balance of hardships in this case can be
8  stated succinctly.  Given the evidence that Union support has
9  been waning since respondent had refused to recognize the Union
10 and has attempted resolve employee grievances without
11 participation by the Union, the Union may continue to lose
12 support and credibility while these claims are litigated without
13 an interim bargaining order.  In light of the strong showing
14 petitioner has made on the merits, the balance of hardships
15 weighs strongly in favor of requiring respondent to recognize the
16 Union.

17     As such, the court finds that the public interest and the
18 balance of hardships weighs in favor of granting the § 10(j)
19 petition.
20 /////
21 /////
22 /////
23 /////
24 /////
25 /////
26 /////
27 /////
28 /////

**ORDER**

For the foregoing reasons, the Board's petition is GRANTED. It is hereby

ORDERED, ADJUDGED AND DECREED that, pending the final disposition of the matters now pending before the National Labor Relations Board, Respondent, its officers, representatives, supervisors, agents, servants, employees, attorneys and all persons acting on its behalf or in participation with it, be, and they hereby are, enjoined and restrained from:

(a)   refusing to recognize and bargain with the Union as the exclusive collective-bargaining representative of Respondent's employees in the Unit, with respect to rates of pay, hours of employment, and other terms and conditions of employment;

(b)   in any like or related manner interfering with, restraining or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

It is further

ORDERED, ADJUDGED AND DECREED that, pending the final disposition of the matters herein now pending before the National Labor Relations Board, Respondent, its officers, representatives, supervisors, agents, servants, employees, attorneys and all persons acting on its behalf or in participation with it, shall take the following affirmative steps:

(a)   recognize and bargain with the Union as the exclusive collective-bargaining representative of employees in the Unit, including processing grievances pursuant to the parties' current collective-bargaining agreement;

32

1     (b)  post copies of the District Court's order at its

2  facilities in all places where notices to its employees are

3  normally posted; maintain these postings during the Board's

4  administrative proceeding free from all obstructions and

5  defacements; grant all employees free and unrestricted access to

6  said postings; and grant to agents of the Board reasonable access

7  to its facilities to monitor compliance with this posting

8  requirement;

9     (c)  Within ten (10) days of the District Court's order,

10  hold a meeting or meetings, scheduled to ensure the widest

11  possible attendance, at which the District Court's order is to be

12  read to the employees by a responsible management official or, at

13  the Employer's option, by a Board Agent in that official's

14  presence; and

15     (d)  Within twenty (20) days of the issuance of the District

16  Court's Decision and Order, file with the District Court and

17  serve upon the Regional Director of Region 20 of the Board, a

18  sworn affidavit from a responsible official describing with

19  specificity the manner in which Respondent has complied with the

20  terms of the Court's decree, including the locations of the

21  posted documents.

22     IT IS SO ORDERED.

23  DATED: August 20, 2010

24  _____

25  FRANK C. DAMRELL, Jr.
     UNITED STATES DISTRICT JUDGE

26

27

28

33